**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

QASIM SHABAZZ (aka CARL THOMAS)
GEORGE WILLIAMS
NADIA METOYER (aka NADIA SIMONE)

          Plaintiffs,

   v.

CITY OF OMAHA, a municipal corporation

OFC. MASON GREGURICH,
in his individual and official capacities

OFC. JAMES VALENCIA-SOETHOUT,
in his individual and official capacities

OFC. ANDREW RATHMAN,
in his individual and official capacities

OFC. WILLIAM KLUG,
in his individual and official capacities

OFC. TREVOR LAPOINT,
in his individual and official capacities

OFC. COURTNEY COLLINS,
in her individual and official capacities

OFC. GILBERTO RIVEROS-ECHAGUE,
in his individual and official capacities

OFC. YULIYA CANTERBURY,
in her individual and official capacities

OFC. MICHAEL ROSIERE,
in his individual and official capacities

OFC. MATTHEW FLORES,
in his individual and official capacities

1

OFC. LUIS REYNOSO-GONAZALEZ,
in his individual and official capacities

SGT. BENJAMINE HOFFMAN,
in his individual and official capacities

LT. SEAN SHERIDAN,
in his individual and official capacities

LT. WILLIAM DAWSON JR.,
in his individual and official capacities

TODD SCHMADERER, in his official
capacity as Chief of Police

Defendants.

**COMPLAINT**

**INTRODUCTION**

1. This cause of action arises out of the September 28, 2025 unlawful seizure and detention of Plaintiffs Qasim Shabazz (aka Carl Thomas), George Williams, and Nadia Metoyer (aka Nadia Simone) by Defendant Officers, occurring at approximately 1:28 a.m. at North 12th Street and Cass Street in Omaha, Nebraska. Plaintiff Qasim Shabazz (aka Carl Thomas) was entrusted with the professional duty of protecting Omaha's champion, professional boxer Terence "Bud" Crawford. This professional security responsibility requires the lawful carrying of a firearm to safeguard the champion from potential threats. Less than twelve hours after the City of Omaha held a victory parade attended by 65,000 residents celebrating Crawford's historic championship—where Mayor John Ewing Jr. presented Crawford with the key to the City—Omaha police officers stopped Crawford's vehicle and drew their service weapons on all occupants. Defendant Officers pointed loaded firearms

directly at Plaintiff Qasim Shabazz (aka Carl Thomas), the very person entrusted to protect the champion the City had just celebrated and the champion, Terence Crawford himself.

2.    This case echoes a shameful chapter in American history when another boxing champion who brought honor to his country—Muhammad Ali, after winning the Olympic gold medal for the United States—was refused service at a restaurant because he was Black. Today, Terence Crawford, a member of his security team, and passengers in his vehicle were treated as common criminals with guns drawn on them, motivated by the color of their skin rather than their conduct. This occurred just hours after Crawford, Omaha's celebrated champion, had been honored with a parade attended by 65,000 residents. Despite Crawford receiving the key to the City that very day, Mr. Crawford and the passengers in his vehicle were held at gunpoint and handcuffed—demonstrating that in 2025, as in Ali's era, being a Black boxing champion offers no immunity from discriminatory treatment.

3.    This cause of action is for damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiffs by the Fourth and Fourteenth Amendments to the United States Constitution against: (1) Defendants Mason Gregurich #2468 ("Officer Gregurich"), James Valencia-Soethout #2607 ("Officer Valencia-Soethout"), Andrew Rathman #2569 ("Officer Rathman"), William Klug #2358 ("Officer Klug"), Trevor Lapoint #2479 ("Officer Lapoint"), Courtney Collins #2598 ("Officer Collins"), Gilberto Riveros-Echague #2535 ("Officer Riveros-Echague"), Yuliya Canterbury #2421 ("Officer Canterbury"), Michael Rosiere #2622 ("Officer Rosiere"), Matthew Flores #2495 ("Officer Flores"), Luis Reynoso-Gonzalez #2540 ("Officer Reynoso-Gonzalez"), Benjamine Hoffman #2393 ("Sergeant Hoffman"), Sean Sheridan #1671 ("Lieutenant Sheridan"), William Dawson Jr. #1512 ("Lieutenant Dawson, Jr."), and Todd Schmaderer ("Chief Schmaderer") in their respective individual and official capacities as duly-certified law

enforcement officers employed by the Omaha Police Department (collectively, the "Defendant Officers"), for their violations of Plaintiffs' rights to be free from excessive force and their failures to intervene; and (2) Defendant City of Omaha ("Omaha" or the "City") for its unconstitutional policy or custom of deploying firearms in response to compliant individuals expressing they have lawful firearms in their vehicle, and for its deliberate indifference in failing to adequately supervise and train officers regarding interactions with citizens lawfully carrying firearms, resulting in constitutional injury.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

5.   This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

6.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

7.   This Court has personal jurisdiction over all Defendants.

8.   In addition, this Court has jurisdiction over Plaintiffs' claims brought under Nebraska Revised Statute § 20-148 because those claims are part of the same case or controversy as Plaintiffs' federal civil rights claims and arise from the same nucleus of operative fact, and § 20-148 provides a civil cause of action for deprivations of rights under color of law, which Plaintiffs assert herein.

## PARTIES

9.   Plaintiff Qasim Shabazz, also known as Carl Thomas, was employed as the personal bodyguard and head of security for professional boxer Terence "Bud" Crawford and was

4

lawfully carrying a concealed firearm pursuant to Nebraska Revised Statute § 28-1202.01 as part of his professional duty.

10. Plaintiff George Williams was a rear passenger in the vehicle.

11. Plaintiff Nadia Metoyer, also known as Nadia Simone, was a rear passenger in the vehicle.

12. At the time of the incident, all Plaintiffs were passengers in a vehicle driven by Terence "Bud" Crawford.

13. Defendant Mason Gregurich ("Officer Gregurich") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

14. Defendant James Valencia-Soethout ("Officer Valencia-Soethout") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

15. Defendant Andrew Rathman ("Officer Rathman") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

16. Defendant William Klug ("Officer Klug") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

17. Defendant Trevor Lapoint ("Officer Lapoint") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

18. Defendant Courtney Collins ("Officer Collins") is sued in her individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

19. Defendant Gilberto Riveros-Echague ("Officer Riveros-Echague") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

20. Defendant Yuliya Canterbury ("Officer Canterbury") is sued in her individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

21. Defendant Michael Rosiere ("Officer Rosiere") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

22. Defendant Matthew Flores ("Officer Flores") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

23. Defendant Luis Reynoso-Gonzalez ("Officer Reynoso-Gonzalez) is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

24. Defendant Benjamine Hoffman ("Sergeant Hoffman") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

25. Defendant William Dawson Jr. ("Lieutenant Dawson, Jr.") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

26. Defendant Sean Sheridan ("Lieutenant Sheridan") is sued in his individual and official capacities as a police officer employed by the Omaha Police Department, acting under color of state law.

27. Defendant Todd Schmaderer ("Chief Schmaderer") is sued in his official capacity as Chief of Police of the Omaha Police Department.

28. Defendant City of Omaha ("the City") is a municipal corporation organized under the laws of Nebraska.

29. At all times relevant to this Complaint, all Defendants were acting under color of state law.

## FACTUAL ALLEGATIONS

30. On September 27, 2025, the City of Omaha held a publicly funded victory parade for Crawford, attended by approximately 65,000 people.

31. Mayor John Ewing Jr. presented Crawford with the Key to the City and a championship belt.

32. Following the parade, Crawford attended a private birthday celebration at Steelhouse Omaha in downtown Omaha.

33. Plaintiffs Qasim Shabazz, George Williams, and Nadia Metoyer accompanied Crawford to the evening celebration.

34. Plaintiff Qasim Shabazz (aka Carl Thomas) is a member of the Black Agenda Alliance and the Black Dawah Network, organizations dedicated to upliftment within the Black community.

35. Plaintiff Qasim Shabazz (aka Carl Thomas) serves as personal bodyguard and head of security for Terence Crawford as part of his commitment to protecting and serving prominent members of the Black community.

36. Through his professional duty protecting Mr. Crawford, Plaintiff Qasim Shabazz (aka Carl Thomas) enables one of the Black community's most accomplished athletes to safely engage with fans, inspire young people, and represent Omaha on the world stage.

37. On September 28, 2025, Plaintiff Qasim Shabazz (aka Carl Thomas) was performing his professional duty as Crawford's personal bodyguard.

38. Plaintiff Qasim Shabazz's (aka Carl Thomas) professional duties required him to carry a firearm.

39. At approximately 1:27 a.m. on September 28, 2025, Terence Crawford (driver), Plaintiff Qasim Shabazz, aka Carl Thomas (front passenger), Plaintiff George Williams (rear passenger), and Plaintiff Nadia Metoyer (rear passenger) departed Steelhouse Omaha in Crawford's 2025 Lucid Sapphire.

40. Plaintiff Qasim Shabazz (aka Carl Thomas) had firearms in the vehicle as part of his professional duty to protect Crawford.

41. At approximately 1:28:09 a.m., Defendant Officers stopped the vehicle at North 12th and Cass Streets with emergency lights activated.

42. Officer Valencia-Soethout approached the passenger side where Plaintiff Qasim Shabazz (aka Carl Thomas) was seated.

43. Officer Gregurich approached the driver's side where Crawford was seated.

44. As Officer Valencia-Soethout reached the passenger window, Plaintiff Qasim Shabazz (aka Carl Thomas) immediately informed Officer Valencia-Soethout in a calm, clear, and respectful tone that he had a firearm on his person.

45. Plaintiff Qasim Shabazz (aka Carl Thomas) made this disclosure within seconds of Officer Valencia-Soethout's approach, in full compliance with Neb. Rev. Stat. § 28-1202.04.

46. Plaintiff Qasim Shabazz (aka Carl Thomas) kept his hands visible.

47. Plaintiff Qasim Shabazz (aka Carl Thomas) made no movements toward his firearm or any other object.

8

48. Plaintiff Qasim Shabazz's (aka Carl Thomas) tone and demeanor were calm, professional, and non-threatening.

49. All Plaintiffs remained seated in their respective seats with seat belts fastened.

50. None of the Plaintiffs made any threatening movements, statements, or gestures.

51. None of the Plaintiffs posed any threat to officer safety.

52. All Plaintiffs were cooperative and compliant from the first moment of contact with Defendant Officers.

53. At approximately 1:28:57 a.m.—three seconds after Plaintiff Qasim Shabazz's (aka Carl Thomas) lawful disclosure—Officer Gregurich drew his service weapon and pointed it at the vehicle occupants, including all Plaintiffs.

54. Officer Valencia-Soethout simultaneously drew his service weapon and pointed it at Plaintiffs.

55. Both officers ordered all occupants, including all Plaintiffs, to exit the vehicle at gunpoint.

56. Mr. Crawford exited the vehicle with his hands visible and was immediately placed in handcuffs.

57. With a gun pointed at Plaintiff Qasim Shabazz's (aka Carl Thomas) head, Officer Valencia-Soethout addressed him regarding his firearm.

58. Officer Valencia-Soethout ordered Plaintiff Qasim Shabazz to hand over his firearm.

59. Plaintiff Qasim Shabazz (aka Carl Thomas), with a gun pointed at his head, refused, stating words to the effect of, "No, I'm not doing that. No, you ain't going to shoot me."

60. Plaintiff Qasim Shabazz (aka Carl Thomas) reasonably feared that reaching for his firearm while Officer Valencia-Soethout had a weapon drawn and pointed at him would result in being shot.

61. To de-escalate the situation, Plaintiff Qasim Shabazz (aka Carl Thomas) told Officer Valencia-Soethout that Defendant could take the firearm from its holster.

62. Plaintiff Qasim Shabazz (aka Carl Thomas) had to instruct Officer Valencia-Soethout on how to properly remove the firearm from the retention holster.

63. Officer Valencia-Soethout followed Plaintiff Qasim Shabazz's (aka Carl Thomas) instructions and removed the firearm from the holster.

64. Plaintiff Qasim Shabazz (aka Carl Thomas) then exited the vehicle and was immediately placed in handcuffs.

65. At some point, additional police officers arrived at the scene, including Defendants Benjamine Hoffman, Andrew Rathman, William Klug, Trevor Lapoint, Courtney Collins, Gilberto Riveros-Echague, Yuliya Canterbury, Michael Rosiere, Matthew Flores, Luis Reynoso-Gonzalez, Sean Sheridan, and William Dawson Jr.

66. The specific time each officer arrived will be determined through discovery of body-worn camera footage and CAD data.

67. One of the Defendant Officers approached the rear passenger side where Plaintiff George Williams was seated.

68. This Defendant Officer drew his firearm and pointed it directly at Plaintiff George Williams's face.

69. Plaintiff George Williams had his hands raised and was fully complying with all commands.

70. The Defendant Officer then ordered Plaintiff George Williams to unbuckle his seatbelt.

71. Plaintiff George Williams stated to the Defendant Officer that the officer could remove the seatbelt himself if he wanted, as Plaintiff George Williams did not want his movements to be misinterpreted.

72.  The officer removed the seatbelt from Plaintiff George Williams.

73.  Plaintiff George Williams turned around as instructed and was immediately placed in handcuffs.

74.  Another Defendant Officer approached the rear driver's side where Plaintiff Nadia Metoyer was seated.

75.  This Defendant Officer drew her weapon and pointed it at Plaintiff Nadia Metoyer.

76.  Plaintiff Nadia Metoyer was ordered to exit the vehicle at gunpoint.

77.  Plaintiff Nadia Metoyer complied with all commands. Plaintiff Nadia Metoyer was not carrying any weapon of any kind.

78.  Plaintiff Nadia Metoyer had made no statements suggesting she possessed any weapon.

79.  Plaintiff Nadia Metoyer had made no movements suggesting she possessed any weapon.

80.  When instructed, all Plaintiffs immediately complied with the officers' commands to exit the vehicle.

81.  As Plaintiffs exited the vehicle with their hands visible and raised, the officers' weapons remained pointed at them.

82.  All four occupants—Crawford, Plaintiff Qasim Shabazz (aka Carl Thomas), Plaintiff George Williams, and Plaintiff Nadia Metoyer —were handcuffed and detained together.

83.  All Plaintiffs remained handcuffed for approximately thirty minutes.

84.  All Plaintiffs experienced intense fear and terror, reasonably believing they could be shot and killed despite having committed no violent crimes.

85.  During this prolonged detention, a crowd of people gathered around the scene.

86.  Multiple members of the public filmed and recorded the incident on their phones and other devices.

87. All Plaintiffs suffered the profound humiliation and indignity of being handcuffed and treated as dangerous criminals in full public view while being filmed.

88. Throughout the entire thirty-minute detention, all Plaintiffs remained calm, cooperative, and compliant.

89. Officers removed both firearms from the vehicle during the stop.

90. Officers removed Plaintiff Qasim Shabazz's (aka Carl Thomas) firearm from his retention holster on his right side.

91. Officers removed Crawford's firearm from the center console between the driver and front passenger seats.

92. Officers ran background checks on both firearms.

93. Both firearms came back clean with no issues or problems.

94. After approximately thirty minutes of detention, officers returned the firearms to Crawford and Plaintiff Qasim Shabazz (aka Carl Thomas).

95. While handcuffed, Plaintiff Qasim Shabazz's (aka Carl Thomas) legally carried firearm—which he carried in the performance of his professional duty to protect Mr. Crawford—was confiscated by officers.

96. All Plaintiffs remained handcuffed and detained for approximately thirty minutes during the traffic stop.

97. None of the Plaintiffs resisted officers' commands at any point.

98. None of the Plaintiffs made any threatening statements or engaged in any conduct that would justify the officers' decision to draw weapons and hold them at gunpoint.

99. At no point did Defendant Officers observe any Plaintiff engage in criminal activity.

100. At no point did Defendant Officers have reasonable suspicion that any Plaintiff was engaged in criminal activity.

101.   At no point did Defendant Officers have probable cause to believe any Plaintiff had committed, was committing, or was about to commit any violent crime.

102.   No Plaintiff was suspected of any violent crime.

103.   The traffic stop was initiated based on the driver's alleged speeding, not for any conduct by any Plaintiff.

104.   All Plaintiffs were passengers in the vehicle with no control over the vehicle's operation.

105.   No Plaintiff posed any immediate threat to the safety of Defendant Officers.

106.   Plaintiff Nadia Metoyer posed absolutely no threat to officer safety.

107.   Plaintiff Nadia Metoyer was not carrying a firearm, made no statements suggesting possession of any weapon, made no movements suggesting possession of a weapon, and posed no conceivable threat to officer safety, yet was subjected to the same use of force as the other occupants.


**COUNT-I**

**Municipal Liability - Ratification by Final Policymaker of Unconstitutional Use-of-Force Policy (42 U.S.C. § 1983)**
**Against City of Omaha**

108.   Plaintiffs re-allege and incorporate all preceding paragraphs.

109.   When Governor Pillen signed LB77 into law, he stated that it "upholds the promise I made to voters to protect our constitutional rights and promote commonsense, conservative values."

110.   Senator Brewer, the bill's sponsor, emphasized that "Nebraskans should not have to pay the government a fee or ask permission for constitutional rights" and expressed pride in helping "Nebraska join twenty-six of our sister states in removing this obstacle to the right to keep and bear arms."

111. Under Nebraska's constitutional carry framework enacted through LB77, the lawful possession and carrying of a concealed firearm is a protected constitutional right.

112. Despite this constitutional right, Defendant Officers drew their service weapons and pointed them at Plaintiffs—compliant, cooperative, non-threatening individuals who posed no danger to officer safety—based solely on the lawful disclosure of firearms.

113. Defendant Officers acted pursuant to an official City policy that authorizes officers to display and point firearms at compliant individuals based solely on the disclosure or presence of lawful firearms, without any additional threatening conduct or objective indicators of danger.

114. Chief Todd Schmaderer, the final policymaker for the Omaha Police Department, confirmed the existence of this policy.

115. Chief Schmaderer further confirmed that officers "acted in accordance with department policy."

116. By confirming that the officers' conduct toward Plaintiffs was "within policy" and "in accordance with department policy," Chief Schmaderer ratified the policy authorizing the use of force—specifically, the drawing and pointing of loaded firearms—against compliant individuals who merely disclose lawful firearms without any threatening movements, gestures, or conduct.

117. This ratification by the City's final policymaker establishes official municipal policy.

118. The City's policy permits officers to point loaded firearms at citizens exercising their constitutional right to carry firearms based solely on disclosure of that constitutional right, without requiring any additional articulable facts suggesting threat or danger.

119. The City's policy of deploying firearms against compliant individuals based solely on lawful firearm disclosure—without any threatening conduct—violates the Fourth Amendment's prohibition against excessive force.

120. The City's ratified policy was the moving force behind the violations of Plaintiffs' constitutional rights.

**COUNT-II**

**Municipal Liability – Policy or Custom of Discriminatory Traffic Stops Against African Americans (42 U.S.C. § 1983)**
**Against City of Omaha**

121. Plaintiffs re-allege and incorporate all preceding paragraphs.

122. The City of Omaha maintains and/or permits a policy, custom, and practice of initiating, conducting, and escalating traffic stops against African American motorists and passengers in a discriminatory manner, resulting in disproportionate uses of force and restraints, including the drawing and pointing of loaded firearms, removal at gunpoint, handcuffing, and prolonged detention, without objective justification.

123. Chief of Police Todd Schmaderer, a final policymaker for the Omaha Police Department, has acknowledged as generally true that the African American community is stopped more by law enforcement and, when stopped, is pulled out at gunpoint more than other races, which evidences municipal knowledge and acquiescence in discriminatory enforcement practices.

124. The City's policymakers were on actual or constructive notice of the discriminatory nature and disparate impact of Omaha Police Department traffic-stop practices on African Americans, yet failed to adopt, implement, or enforce policies, training,

supervision, data collection, or corrective measures sufficient to prevent discriminatory stops and escalations, thereby demonstrating deliberate indifference.

125. The City's policy or custom, including ratification by its final policymaker, was the moving force behind the discriminatory stop, escalation to firearms, removal at gunpoint, handcuffing, and prolonged detention of Plaintiffs—each of whom is African American—despite their compliance, lack of threat, and absence of criminal suspicion.

126. As a direct and proximate result of the City's policy, custom, and deliberate indifference, Plaintiffs suffered physical, emotional, psychological, and dignitary injuries, including intense fear of being shot, humiliation in public view, pain from tight handcuffing, ongoing anxiety and distress, reputational harm, and expenses for treatment and counseling, and they continue to suffer damages.

127. Plaintiffs seek compensatory damages against the City for all injuries described herein, together with attorneys' fees and costs as permitted by law.


**COUNT-III**
**Municipal Liability – Failure To Train (42 U.S.C. § 1983)**
**Against City of Omaha**

128. Plaintiffs re-allege and incorporate all preceding paragraphs.

129. The City failed to adequately train Omaha Police Department officers on constitutional limitations governing the use of force during encounters with citizens lawfully carrying firearms pursuant to Nebraska Revised Statute § 28-1202.01.

130. Specifically, the City failed to train officers that the lawful possession of a firearm, standing alone, does not create reasonable suspicion of criminal activity.

16

131. The lawful disclosure of a firearm pursuant to Nebraska Revised Statute § 28-1202.04 does not justify the use of force.

132. The pointing of a firearm at an individual constitutes a significant use of force that may only be employed when officers have reasonable belief the individual poses an immediate threat of serious physical harm.

133. The City failed to provide scenario-based training on traffic stops involving lawfully armed citizens under Nebraska's constitutional carry law.

134. The City failed to establish clear policies and protocols governing officer responses to lawful firearm disclosures.

135. Nebraska's constitutional carry law (LB77) became effective on September 2, 2023, fundamentally altering the legal landscape regarding firearm possession in Nebraska.

136. This fundamental change in Nebraska law created an obvious need for specialized training on how officers should interact with lawfully armed citizens.

137. The need for such training was especially obvious given that LB77 requires individuals to immediately disclose firearms to officers during any official contact, ensuring officers would frequently encounter lawfully armed citizens during routine traffic stops.

138. Despite this actual notice, the City failed to develop or implement adequate training for the more than two years between LB77's effective date and this incident.

139. The obviousness of the training need is further demonstrated by the fact that following this incident, the City acknowledged the need for and committed to implementing scenario-based training specifically addressing LB77 encounters.

## COUNT-IV

### Municipal Liability – Failure to Supervise (42 U.S.C. § 1983)
### Against City of Omaha

140.   Plaintiffs re-allege and incorporate all preceding paragraphs.

141.   At all relevant times, Defendant City of Omaha, by and through its final policymakers, including, but not limited to Chief of Police Todd Schmaderer, was responsible for the supervision of all Omaha Police Department officers, including Defendants Gregurich and Valencia-Soethout, and for ensuring that officers complied with constitutional limitations on the use of force and proper conduct toward lawfully armed citizens.

142.   The City of Omaha maintained and/or permitted a widespread practice, custom, or policy of failing to supervise its officers in interactions with citizens lawfully carrying firearms, including failing to ensure proper oversight, monitoring, and accountability when officers deployed force based solely on lawful disclosure or presence of a firearm.

143.   The City, with actual or constructive knowledge, failed to provide adequate supervisory review or discipline in response to officer conduct involving uses of force against compliant, non-threatening individuals during traffic stops, including but not limited to this incident involving Plaintiffs, where Defendant Officers immediately escalated to the use of firearms and handcuffs despite the absence of any threat, suspicious conduct, or criminal activity by any Plaintiff.

144.   Despite having actual notice of the need for robust supervision and oversight—especially in light of Nebraska's constitutional carry law (LB77) requiring citizens to disclose lawful firearms during officer encounters—Defendant City and its final policymakers failed to implement effective mechanisms to supervise, review, or discipline officers engaging in escalated use of force in these encounters, creating a substantial risk that officers would violate constitutional rights in the manner alleged here.

18

145. The widespread and persistent lack of effective supervision is further evidenced by the City's acknowledgment, after this incident, of systemic deficiencies regarding officer responses to lawfully armed citizens, and by the confirmation by Chief Schmaderer that the subject officers acted "in accordance with department policy," even when such conduct resulted in constitutional violations against compliant, cooperative individuals.

146. The deliberate indifference by Defendant City and its final policymakers to the need for adequate supervision of officers—including monitoring, reviewing, and disciplining acts of excessive force in response to lawful firearm disclosures—directly and proximately caused or was a moving force behind the violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments as alleged herein.

147. As a direct and proximate result of the City's failure to supervise, Plaintiffs suffered physical, emotional, psychological, and dignitary injuries as described above.

## COUNT-V

## Equal Protection Violation (42 U.S.C. § 1983)

**Against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and Dawson Jr.**

148. Plaintiffs re-allege and incorporate all preceding paragraphs.

149.  All Plaintiffs are African American.

150. Terence Crawford, the driver of the vehicle in which Plaintiffs were passengers, is African American.

151.  Defendant Officers were aware that the vehicle's occupants were African American from the moment they approached the vehicle.

152. Defendant Officers subjected Plaintiffs to significant use of force by drawing their service weapons, pointing loaded firearms at Plaintiffs, forcibly removing them from the vehicle at gunpoint, handcuffing them, and detaining them for approximately thirty minutes.

153. This use of force was applied even though: All Plaintiffs were compliant and cooperative; No Plaintiffs posed any threat to officer safety; No Plaintiffs made any threatening movements, gestures, or statements; Plaintiff Qasim Shabazz (aka Carl Thomas) lawfully disclosed his firearm as required by state law in a calm and professional manner; All Plaintiffs immediately complied with every officer directive; and, No Plaintiff was suspected of any criminal activity.

154. Upon information and belief, Defendant Officers would not have subjected similarly situated white individuals to the same use of force under comparable circumstances.

155. Upon information and belief, the Omaha Police Department does not routinely draw weapons and hold white citizens at gunpoint when those citizens calmly and lawfully disclose that they are carrying legal firearms pursuant to Nebraska's constitutional carry law while remaining cooperative and non-threatening.

156. Chief of Police Schmaderer has acknowledged as true that "the African American community is stopped more by law enforcement and then when stopped more by law enforcement is pulled out at gunpoint more than disproportionate to the other classes and races in our society and that is quite frankly, the answer to that is that is generally a true statement..."

157. The Omaha Police Department officers engage in a pattern and practice of subjecting African Americans to disproportionate use of force during traffic stops.

158.   Upon information and belief, white individuals who lawfully disclose firearms during traffic stops while not threatening are not subjected to having loaded weapons pointed at them, being forcibly removed from vehicles at gunpoint, or being detained in handcuffs.

159.   The immediate escalation to significant force—within three seconds of lawful firearm disclosure—against compliant African American individuals reflects discriminatory policing practices.

160.   Defendant Officers' response was not based on any objective threat assessment but rather on implicit bias and discriminatory assumptions about African Americans with firearms.

161.   The use of excessive force against all four occupants, regardless of their roles or threat levels, suggests that race, rather than individual assessment, motivated the Defendant Officers' actions.

## COUNT-VI

### Excessive Force in Violation of the Fourth Amendment (42 U.S.C. § 1983)
### Against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins
### Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and
### Dawson Jr.

162.   Plaintiffs re-allege and incorporate all preceding paragraphs.

163.   The Fourth Amendment to the United States Constitution protects individuals from unreasonable seizures and prohibits the use of excessive force.

164.   When Governor Pillen signed LB77 into law, he stated that it "upholds the promise I made to voters to protect our constitutional rights and promote commonsense, conservative values."

165.   Senator Brewer, the bill's sponsor, emphasized that "Nebraskans should not have to pay the government a fee or ask permission for constitutional rights" and expressed pride in

helping "Nebraska join twenty-six of our sister states in removing this obstacle to the right to keep and bear arms."

166. Under Nebraska's constitutional carry framework enacted through LB77, the lawful possession and carrying of a concealed firearm is a protected constitutional right, and the required disclosure of such firearms to law enforcement during official contact cannot, standing alone, constitute reasonable suspicion of criminal activity or justify the use of significant force.

167. On September 28, 2025, Defendant Officer Valencia-Soethout used excessive force against Plaintiff Qasim Shabazz (aka Carl Thomas) by drawing his service weapon, pointing a loaded firearm directly at Plaintiff Qasim Shabazz (aka Carl Thomas), ordering him to remove his own firearm while holding him at gunpoint, forcibly removing Plaintiff Qasim Shabazz (aka Carl Thomas) from the vehicle at gunpoint, handcuffing him, and detaining him in handcuffs for approximately thirty minutes.

168. On September 28, 2025, Defendant Officer Gregurich used excessive force against Plaintiff Qasim Shabazz (aka Carl Thomas) by drawing his service weapon and pointing a loaded firearm directly at Plaintiff Qasim Shabazz (aka Carl Thomas), ordering him from the vehicle at gunpoint, and participating in his handcuffing and detention for approximately thirty minutes.

169. On September 28, 2025, Defendant Officer John Doe used excessive force against Plaintiff George Williams by drawing his service weapon, pointing a loaded firearm directly at Plaintiff George Williams's face while he had his hands raised in compliance, ordering him to unbuckle his seatbelt at gunpoint, forcibly removing him from the vehicle at gunpoint, handcuffing him, and detaining him in handcuffs for approximately thirty minutes.

170. On September 28, 2025, Defendant Officer Jane Doe used excessive force against Plaintiff Nadia Metoyer by drawing her service weapon, pointing a loaded firearm directly at Plaintiff Nadia Metoyer, ordering her from the vehicle at gunpoint, handcuffing her, and detaining her in handcuffs for approximately thirty minutes.

171. The force used by Defendant Officer Valencia-Soethout against Plaintiff Qasim Shabazz (aka Carl Thomas) was excessive because Plaintiff Qasim Shabazz (aka Carl Thomas) made no threatening movements, gestures, or statements; posed no immediate threat to officer safety; was not suspected of any violent crime; and did nothing to justify having a loaded weapon pointed at him or being detained at gunpoint and in handcuffs.

172. The force used by Defendant Officer Gregurich against Plaintiff Qasim Shabazz (aka Carl Thomas) was excessive because Plaintiff Qasim Shabazz (aka Carl Thomas) was calm, cooperative, and compliant; immediately disclosed his lawfully carried firearm as required by state law; made no threatening movements, gestures, or statements; posed no immediate threat to officer safety; was not suspected of any violent crime; and did nothing to justify having a loaded weapon pointed at him or being detained at gunpoint and in handcuffs.

173. The force used by Defendant Officer John Doe against Plaintiff George Williams was excessive because Plaintiff George Williams made no threatening movements, gestures, or statements; posed no immediate threat to officer safety; was not suspected of any violent crime; was not carrying any weapon; made no statements suggesting he possessed any weapon; and did nothing to justify having a loaded weapon pointed directly at his face or being detained at gunpoint and in handcuffs.

174. The force used by Defendant Officer Jane Doe against Plaintiff Nadia Metoyer was excessive because Plaintiff Nadia Metoyer made no threatening movements, gestures, or

statements; posed no immediate threat to officer safety; was not suspected of any crime; was not carrying any weapon; made no statements suggesting she possessed any weapon; and did nothing to justify having a loaded weapon pointed at her or being detained at gunpoint and in handcuffs.

175.  Holding Plaintiffs at gunpoint based solely on their lawful exercise of constitutional rights-specifically, their disclosure of concealed firearms as required by law-without any additional objective indicators of threat, danger, or criminal activity, is constitutionally excessive and unreasonable under the Fourth Amendment.

176.  A reasonable officer would understand that compliant citizens who voluntarily disclose lawful firearms in non-threatening circumstances while exercising their constitutional rights under LB77 do not pose the immediate threat of serious physical harm necessary to justify pointing loaded weapons at them.

177.  The seizure of Plaintiffs was complete when Defendant Officers drew their weapons, pointed them at Plaintiffs, and ordered them from the vehicle.

178.   The pointing of a loaded firearm at an individual constitutes a significant use of force under the Fourth Amendment.

179.   Defendant Officers used force against Plaintiffs by drawing their service weapons, pointing loaded firearms directly at Plaintiffs, ordering Plaintiffs from the vehicle at gunpoint; forcibly removing Plaintiffs from the vehicle while holding them at gunpoint, and placing Plaintiffs in handcuffs; and detaining Plaintiffs in handcuffs for approximately thirty minutes.

180.   This use of force was significant and constituted a substantial intrusion on Plaintiffs' liberty interests.

181.  The mere presence of lawfully carried firearms does not, standing alone, create reasonable belief that an individual poses a threat to officer safety.

182.  Plaintiffs were compliant and cooperative at all times, made no threatening movements, gestures, or statements, and posed no threat to officer safety.

183.  No Plaintiff was suspected of any violent crime or posed any immediate threat to the safety of Defendant Officers or others.

184.  As a direct and proximate result of Defendant Officers' conduct, all Plaintiffs suffered physical, emotional, psychological, and dignitary injuries, and continue to suffer damages.

**COUNT-VII**

**Failure to Intervene in Violation of the Fourth Amendment (42 U.S.C. § 1983)
Against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins
Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan,
and Dawson Jr.**

185.  Plaintiffs re-allege and incorporate all preceding paragraphs.

186.  Law enforcement officers have an affirmative duty to intervene to prevent fellow officers from violating the constitutional rights of citizens.

187.  An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had a realistic opportunity to intervene to prevent the harm from occurring.

188.  Defendant Officers Gregurich and Valencia-Soethout were present during the entire encounter with Plaintiffs from the initial stop.

189.  Defendant Officers Jane Doe and John Doe arrived on the scene, pointed weapons at Plaintiffs George Williams and Nadia Metoyer, and participated in handcuffing and detaining Plaintiffs.

190. Defendant Officers Benjamine Hoffman, Andrew Rathman, William Klug, Trevor Lapoint, Courtney Collins, Gilberto Riveros-Echague, Yuliya Canterbury, Michael Rosiere, Matthew Flores, Luis Reynoso-Gonzalez, Sean Sheridan, and William Dawson Jr. arrived on the scene as backup officers in response to Officer Gregurich's radio transmission about firearms in the vehicle.

191. All Defendant Officers were in close proximity to one another during the incident.

192. All Defendant Officers were aware of and observed each other's conduct toward Plaintiffs.

193. All officers communicated with each other during the incident.

194. Officer Gregurich made declarations to Officer Valencia-Soethout regarding bringing all occupants out of the vehicle.

195. Each Defendant Officer observed other officers drawing weapons and pointing them at compliant, cooperative, non-threatening Plaintiffs who posed no danger to officer safety.

196. Each Defendant Officer had a duty to intervene to prevent their fellow officers from using excessive force against Plaintiffs.

197. This duty arose when each officer observed other officers engaging in conduct that violated Plaintiffs' constitutional rights.

198. Each officer had a realistic opportunity to intervene by instructing fellow officers that drawing weapons on cooperative, non-threatening individuals was unnecessary and unjustified, or by suggesting de-escalation techniques.

199. Each officer had sufficient time and opportunity to intervene before and during the use of excessive force.

200. Despite having a duty to intervene and a realistic opportunity to do so, Defendant Officers Gregurich, Valencia-Soethout, Hoffman, Rathman, Klug, Lapoint, Collins,

Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Sheridan, and Dawson Jr. each failed to take any action to prevent their fellow officers from using excessive force against Plaintiffs Qasim Shabazz (aka Carl Thomas), George Williams, and Nadia Metoyer.

201. Instead of intervening to prevent excessive force, each officer either joined in or stood by while excessive force was applied against Plaintiffs.

202. At the time of this incident, it was clearly established that officers have a duty to intervene to prevent fellow officers from violating citizens' constitutional rights.

203. As a direct and proximate result of each Defendant Officer's failure to intervene, all Plaintiffs suffered physical, emotional, psychological, and dignitary injuries as alleged herein.

204. Each Defendant Officer's failure to intervene was willful and malicious, demonstrating reckless disregard for Plaintiffs' constitutional rights.

205. Plaintiffs are entitled to punitive damages to punish Defendant Officers' failures to intervene and deter similar conduct in the future.

## COUNT-VIII
### Violation of Nebraska Civil Rights Statute, Neb. Rev. Stat. § 20-148
### Against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and Dawson Jr.

206. Plaintiffs re-allege and incorporate all preceding paragraphs.

207. At all times relevant, Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and Dawson Jr. were acting under color of law as duly-certified officers of the

27

Omaha Police Department during the stop and detention of Plaintiffs on September 28, 2025.

208. Neb. Rev. Stat. § 20-148 provides a civil cause of action for deprivations of rights secured by the federal or state constitutions and laws by persons acting under color of law.

209. Defendants, acting under color of law, deprived Plaintiffs of their rights to be free from excessive force and unreasonable seizures under the Fourth Amendment, actionable pursuant to § 20-148. These deprivations include drawing and pointing loaded firearms at Plaintiffs, ordering them from the vehicle at gunpoint, placing them in handcuffs, and detaining them for approximately thirty minutes despite Plaintiffs' compliance, lack of threat, and absence of criminal suspicion.

210. Defendants, acting under color of law, discriminated against Plaintiffs on the basis of race, in violation of the Equal Protection Clause, actionable pursuant to § 20-148. Plaintiffs are African American; Defendants were aware of their race; and Defendants escalated to significant force within seconds of a lawful firearm disclosure, treating Plaintiffs as threats without objective justification, while similarly situated white individuals would not have been subjected to such force.

211. The City of Omaha is liable under § 20-148 because Plaintiffs' deprivations were caused by the City's official policy or custom, ratified by the final policymaker, authorizing officers to display and point firearms at compliant individuals based solely on the disclosure or presence of lawful firearms, and by the City's deliberate indifference in failing to train officers concerning Nebraska's constitutional carry framework and lawful firearm disclosures.

212. Plaintiffs complied with Nebraska law by immediately disclosing the presence of a firearm and remaining calm, visible, and non-threatening, yet Defendants responded with significant force and prolonged detention without reasonable suspicion or probable cause, thereby violating rights secured by law and actionable under § 20-148.

213. As a direct and proximate result of Defendants' violations of Plaintiffs' rights under § 20-148, Plaintiffs suffered physical, emotional, psychological, and dignitary injuries, including intense fear, humiliation in public view, pain from tight handcuffing, and ongoing distress, for which they seek all remedies available under § 20-148.

## COUNT-IX

**Excessive Force in Violation of the Nebraska Constitution (Neb. Const. art. I, § 7) Against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and Dawson Jr.**

214. Plaintiffs re-allege and incorporate all preceding paragraphs.

215. Article I, Section 7 of the Nebraska Constitution protects individuals from unreasonable searches and seizures.

216. On September 28, 2025, Defendant Officers seized Plaintiffs within the meaning of the Nebraska Constitution by ordering them from the vehicle at gunpoint, handcuffing them, and detaining them for approximately thirty minutes.

217. The use of force included drawing service weapons, pointing loaded firearms directly at Plaintiffs, ordering Plaintiffs from the vehicle at gunpoint, and placing Plaintiffs in handcuffs.

218. Plaintiffs were compliant and cooperative at all times, made no threatening movements, gestures, or statements, and posed no threat to officer safety.

219. No Plaintiff was suspected of any violent crime or posed any immediate threat to the safety of Defendant Officers or others.

220. The force used was unreasonable and excessive under the circumstances and violated Plaintiffs' rights under the Nebraska Constitution's prohibition on unreasonable seizures and excessive force.

221. As a direct and proximate result of Defendant Officers' conduct, all Plaintiffs suffered physical, emotional, psychological, and dignitary injuries, and continue to suffer damages.

222. Plaintiffs seek damages and any other relief as deemed appropriate by the Court as a result of these constitutional violations.

## COUNT-X

### Equal Protection in Violation of the Nebraska Constitution (Neb. Const. art. I, §§ 1, 3)

223. Plaintiffs re-allege and incorporate all preceding paragraphs.

224. Article I, Section 1 and/or Section 3 of the Nebraska Constitution guarantees equal protection of the laws to all persons.

225. All Plaintiffs are African American.

226. Defendant Officers were aware of Plaintiffs' race when they initiated and conducted the stop.

227. Defendant Officers subjected Plaintiffs to a significant use of force—drawing and pointing loaded firearms, forcibly removing Plaintiffs from the vehicle at gunpoint, handcuffing them, and detaining them for approximately thirty minutes—despite Plaintiffs being cooperative, compliant, and posing no threat.

228.  Upon information and belief, Defendant Officers would not have subjected similarly situated white individuals to the same use of force under comparable circumstances.

229.  Defendant Officers' actions were motivated by discriminatory assumptions and implicit bias concerning African Americans, not objective threat assessment.

230.  All Plaintiffs suffered damages as a result of the unequal treatment based on their race, including emotional distress, humiliation, and dignitary injury.

231.  Plaintiffs seek damages and any other relief as deemed appropriate by the Court as a result of these violations of the Nebraska Constitution's guarantee of equal protection.

**PLAINTIFFS' INJURIES AND DAMAGES**

232.  As a direct and proximate result of Defendant Officers' unconstitutional conduct, all Plaintiffs suffered and continue to suffer significant physical, emotional, psychological, and dignitary injuries.

233.  During the incident, all Plaintiffs experienced intense fear and terror, reasonably believing they could be shot and killed despite having committed no violent crimes.

234.  Plaintiff Qasim Shabazz (aka Carl Thomas) feared that complying with Officer Valencia-Soethout's order to remove his own firearm would result in officers shooting him.

235.  Plaintiff George Williams specifically feared that any movement to unbuckle his seatbelt would result in officers shooting him and claiming they thought he was reaching for a weapon.

236.  All Plaintiffs suffered physical pain and discomfort from being handcuffed tightly for approximately thirty minutes.

237. All Plaintiffs suffered the profound indignity and humiliation of being treated as dangerous criminals in public view while a crowd gathered and filmed the incident, despite having done nothing wrong and posing no threat to anyone.

238. Since the incident, all Plaintiffs have suffered from anxiety, stress, post-traumatic stress symptoms, and emotional distress related to the encounter.

239. All Plaintiffs have experienced sleep disturbances, intrusive thoughts about the incident, and hypervigilance during subsequent interactions with law enforcement.

240. All Plaintiffs have suffered emotional distress from the knowledge that their lawful conduct—including Plaintiff Qasim Shabazz's (aka Carl Thomas) compliance with Nebraska's statutory disclosure requirement—resulted in them being held at gunpoint and treated as threats.

241. The incident has caused all Plaintiffs to question their safety and security when interacting with law enforcement, even when they are acting lawfully.

242. All Plaintiffs' trust in law enforcement has been damaged by Defendant Officers' actions and by the subsequent determination that those actions were "in accordance with department policy."

243. All Plaintiffs have been forced to relive the traumatic experience through extensive media coverage, community discussions, and the internal investigation process.

244. For Plaintiff Qasim Shabazz (aka Carl Thomas), whose professional reputation as Mr. Crawford's bodyguard and security specialist depends on his sound judgment, calm demeanor under pressure, and ability to maintain positive working relationships with law enforcement, the incident and its public nature have affected his professional standing and reputation.

245. All Plaintiffs have incurred and will continue to incur expenses related to addressing the physical and psychological injuries caused by Defendants' conduct, including but not limited to costs for counseling, therapy, and medical treatment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

Award compensatory damages to Plaintiffs for the physical, emotional, psychological, and dignitary injuries suffered as a direct and proximate result of Defendants' unconstitutional conduct, including expenses related to addressing said injuries such as counseling, therapy, and medical treatment.

Award punitive damages against Defendants Gregurich, Valencia-Soethout, Rathman, Klug, Lapoint, Collins, Riveros-Echague, Canterbury, Rosiere, Flores, Reynoso-Gonzalez, Hoffman, Sheridan, and Dawson Jr., in their individual capacities for their willful, malicious, and reckless disregard for Plaintiffs' constitutional rights, including their failure to intervene.

Enter declaratory judgment that Defendants' actions and the City of Omaha's policy or custom regarding the use of force against compliant, lawfully armed individuals, as alleged in this Complaint, violate Plaintiffs' rights under the United States Constitution.

Enter declaratory judgment that Defendants' actions and the City of Omaha's policy or custom regarding discriminatory traffic stops against African Americans, as alleged in this Complaint, violate Plaintiffs' rights under the United States Constitution.

Enter appropriate injunctive relief enjoining the City of Omaha from maintaining or enforcing the policy or custom of deploying firearms in response to the lawful disclosure or possession of firearms by compliant individuals and requiring adequate training or reforms regarding constitutional encounters with lawful firearm carriers.

Enter further injunctive relief requiring the City of Omaha to collect and maintain statistical data on traffic stops, including at minimum: the race of all occupants; whether any occupant lawfully possessed a firearm; and other relevant stop-related data reasonably necessary to assess compliance with constitutional standards and Nebraska law.

Award Plaintiffs their reasonable attorneys' fees, expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

Award such other and further relief as the Court deems just and proper.

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 8, 2025

Respectfully submitted,
/s/ Hakeem Muhammad
Hakeem Muhammad
Muhammad Law Center
10846 South Halsted
Chicago, IL 60628

/s/ Ezinné Adibe Ranger*
Ezinné Adibe Ranger
Ezinne Law PLLC
437 Turnpike Street
#8772
Canton, MA 02021

Attorneys for Plaintiffs

*Pro hac vice or Admission pending